# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **HUBERT THOMPSON**, | : | |
| | : | |
| Plaintiff, | : | CASE NO.: |
| | : | |
| v. | : | |
| | : | |
| **JAMES C. ROVELLA**, Chief of Police, | : | |
| City of Hartford, In His Official Capacity; | : | |
| **ANTHONY KOZIERADZKI**; | : | |
| **LIAM PESCE**, Sergeant, City of Hartford, | : | |
| In His Individual and Official Capacities; | : | |
| **TUYEN BERGENHOLTZ**, Officer, | : | |
| City of Hartford, In Her Individual and Official | : | |
| Capacities; **JANE DOE/JOHN DOE**, Supervisor, | : | |
| Crimes Against Persons Unit, City of Hartford, In | : | |
| Her/His Individual and Official Capacities; | : | |
| **JANE DOE(S)/JOHN DOE(S)**, | : | |
| Evidence Officer(s) (2003-2014), City of Hartford, | : | |
| In Their Individual Capacities, | : | **DEMAND FOR TRIAL BY JURY** |
| | : | |
| Defendants. | : | NOVEMBER 25, 2015 |

## COMPLAINT AND ACTION FOR INJUNCTIVE RELIEF

### PRELIMINARY STATEMENT

1. This is an action for damages arising from the deliberate indifference of the City of Hartford to a statutory mandate which requires all Connecticut peace officers to disclose in writing any exculpatory information or material which he or she may have with respect to any criminal investigation to the prosecutorial official in charge of such case.

2. Section 54-86c(e) of the Connecticut General Statutes provides: "Each peace officer, as defined in subdivision (9) of section 53a-3, shall disclose in writing any exculpatory information or material which he may have with respect to any criminal investigation to the prosecutorial official in charge of such case."

3. Plaintiff Hubert Thompson ("Thompson") claims damages of 4.5 million dollars ($4,500,000) caused by the Defendants' conduct in his arrest, prosecution, and incarceration, including but not limited to the Defendants' deliberate indifference to the statutory and constitutional duty of Connecticut peace officers to disclose DNA evidence for exculpatory testing.

## JURISDICTION

4. This district court had original jurisdiction over Thompson's federal claims pursuant to 28 U.S.C. §§ 1331, 1343(a)(3).

5. This district court has supplemental jurisdiction over Thompson's other claims pursuant to 28 U.S.C. § 1367 as they are sufficiently related to the claims in this action over which the court has original jurisdiction.

6. Venue is proper in this district as all or nearly all of the individual Defendants reside within this district and all of the events giving rise to the claims asserted herein occurred within this district.

## PARTIES

7. Plaintiff Hubert Thompson is an adult resident of Connecticut.

8. Defendant James C. Rovella ("Rovella") is the Chief of Police for the City of Hartford's police department and is sued in his official capacity.

9. Defendant City of Hartford is a municipality in Connecticut as defined and described by section 7-148 of the Connecticut General Statutes.

10. Defendant Anthony Kozieradzki ("Kozieradzki") was a City of Hartford patrol officer on September 23, 1994, through October 2, 1998, and retired, upon information and belief in 2005. Kozieradzki is sued in his individual capacity.

11. While employed by the City of Hartford at all times relevant to the allegations in this Complaint Kozieradzki acted under color of state law.

12. Defendant Liam Pesce ("Pesce") is a City of Hartford sergeant and serves as the department's evidence officer. At all times relevant to this Complaint Pesce acted under color of state law.

13. Pesce is sued in his individual and official capacities.

14. Defendant Tuyen Bergenholtz ("Bergenholtz") is a City of Hartford officer and serves as the department's evidence officer. At all times relevant to this Complaint Pesce acted under color of state law.

15. Bergenholtz is sued in her individual and official capacities.

16. Defendant Evidence Officer Jane Does/John Does ("Evidence Officer") were or are City of Hartford peace officers who served as the department's evidence officers. At all times relevant to this Complaint they acted under color of state law.

17. Evidence Officer Jane Does/John Does are sued in their individual capacities.

18. Defendant Jane Doe/John Doe ("CAPERS Supervisor") was at all times relevant to the Complaint between September 23, 1994, and October 2, 1998, the City of Hartford's Supervisor of the Crimes Against Persons Unit. The CAPERS Supervisor acted during this period under color of state law.

19. The CAPERS Supervisor is sued in her/his individual and official capacities.

## ALLEGATIONS OF FACT

A. October 1 and 2, 1998, Criminal Trial

20. Thompson pleaded not guilty to one count of kidnapping in the first degree, one count of sexual assault in the first degree, and one count of attempt to commit sexual assault in the

3

first degree at the commencement of trial on October 1, 1998, before The Honorable Raymond R. Norko at the Superior Court in Hartford.

21. The criminal trial for three felonies having a combined maximum period of incarceration of sixty-five years lasted two days and consisted of five witnesses (Jane Doe, Anthony Silva Jr., Officer Anthony Kozieradzki, Detective Louisa St. Pierre, and Dr. Linda H. Crabbe) and five exhibits offered by the prosecution.

22. The first witness, Jane Doe, was a thirty-four year old woman who left the apartment she shared with her boyfriend Anthony Silva Jr. at 873 West Boulevard driving his 1990 Nissan Stanza to purchase drugs at 11 PM on September 23, 1994.

23. Doe told Silva that she was leaving to purchase cigarettes.

24. In the vicinity of South Marshall Street and Case Street in Hartford, Doe was approached by a male whom she had previously purchased drugs from on credit according to her testimony.

25. The male slapped Doe, pulled her out of Silva's 1990 Nissan Stanza, took Doe to the side of a building on Case Street, pulled down Doe's pants, and sodomized Doe with the tip of his penis after an unsuccessful attempt to penetrate her vagina attributed by Doe to the fact that she was standing facing a building with her back toward the male.

26. Doe testified that when the assault lasting 15-20 minutes was over she and the male then walked past the crowded area of the South Marshall Street and Case Street intersection and both entered the 1990 Nissan Stanza, the male in the driver seat and Doe in the passenger seat.

27. The male drove around Hartford until Doe was able to exit the car at the intersection of Capitol Avenue and Whitney Street when the male stopped for a red light.

28. The apartment that Doe shared with Silva at 873 West Boulevard happened to be nearby so Doe ran home.

29. Doe was gone for an hour and thirty minutes and when she returned home to Silva she told Silva that she had been sexually assaulted and that her assailant had stolen Silva's car.

30. Doe never told Silva that she had left their apartment at 11 PM on September 23, 1994, to purchase drugs using his car and at the time of trial more than four years later Silva remained unaware of that fact.

31. Silva called the police and Doe was taken to Saint Francis Hospital where she remained for approximately three hours according to the hospital records.

32. The emergency room physician from Saint Francis Hospital, Dr. Linda H. Crabbe, who was on duty on September 23, 1994, but had not treated Doe, testified that Doe had "abrasions of the vagina and the rectum which are consistent with sexual assault."

33. Silva's car and all of Doe's personal possessions in the car were returned the next evening by an unnamed male Doe knew as a drug dealer.

34. Detective St. Pierre showed Doe an array of eight photographs on February 23, 1995.

35. Doe identified the photograph of Thompson as the male who had pulled her from the car on September 23, 1994, and sexually assaulted her on Case Street.

36. Doe then identified Thompson in court as the male who had pulled her from the car on September 23, 1994, and sexually assaulted her on Case Street.

37. Doe provided a written statement to Detective St. Pierre under oath on February 23, 1995, that omitted the fact that Doe had used Silva's 1990 Nissan Stanza to drive to South Marshall Street and Case Street to purchase drugs.

5

38. After Detective St. Pierre testified on October 2, 1998, the state and the defense stipulated to: "[T]he fact that a rape kit was secured at the hospital, and sent to the lab for analysis, and the findings were all negative. Negative rape kit."

39. The state laboratory had not been able to identify semen stains on the purple underwear in the "rape kit" that it received from the HPD on October 13, 1994, and was unable to perform testing on the acid phosphatase biological remains that the state laboratory did identify on the underwear.

40. There was no further evidence concerning the "rape kit."

41. The state laboratory returned the "rape kit" which contained purple underwear with semen stains to the HPD.

42. The Court admitted five exhibits offered by the prosecution: (a) (State Ex. 1) A name card with Doe's name spelled incorrectly; (b) (State Ex. 2) Photographs of the 1990 Nissan Stanza; (c) (State Ex. 3) Photo Array; (d) (State Ex. 4) Doe's Written Statement; and (e) (State Ex. 5) Hospital Records.

43. The Court took judicial notice after oral argument on the admissibility of a pending criminal charge of prostitution against Doe that at the time of trial: (a) There was a pending criminal misdemeanor case against Doe; (b) Doe had applied for Accelerated Rehabilitation in the case; (c) An assertion that Doe had made under oath in applying for AR had been untruthful; and (d) The prosecution had brought an additional criminal charge against Doe based on the untruthful assertion.

44. At the conclusion of evidence on October 2, 1998, the Court took a recess and returned with a verdict of guilty on each of the three counts against Thompson.

45. The Court sentenced Thompson to twelve years of incarceration when Thompson returned for sentencing on November 20, 1998, as follows:

> It will be the sentence of this court that the defendant will be sentenced to the commissioner of corrections for a period of twelve years to serve on the kidnapping in the 1st degree. He'll be sentenced to the commissioner of corrections for a period of twelve years to serve on the sexual assault in the 1st degree. He'll be sentenced to the commissioner of corrections for a period of twelve years to serve on the criminal intent to commit sexual assault in the 1st degree. The sentences will run concurrent to each other but consecutive to the federal sentence he is now serving.

46. At the time of sentencing on November 20, 1998, Thompson was serving a ten-year federal sentence.

47. Thompson began serving the state court sentence of twelve years on December 12, 2007.

48. Between the time of trial in 1998 and the commencement of Thompson's state court sentence on December 12, 2007, substantial advancements had been made in DNA testing.

49. If the HPD had submitted the purple pair of underwear seized in Thompson's case to the state laboratory for testing in 2006 when the exoneration of another HPD arrestee made it apparent that substantial advancements in DNA testing could uncover wrongful convictions Thompson would have been exonerated without having to serve any time on a sentence imposed by a wrongful conviction, saving Connecticut substantial sums awarded to Thompson pursuant to section 54-102uu of the Connecticut General Statutes, entitled "Compensation for Wrongful Incarceration" and, most importantly, Thompson would not have been imprisoned for crimes he did not commit.

B. <u>Exoneration of James Tillman</u>

50. The Hartford Police Department (HPD) arrested James Tillman ("Tillman") on charges arising from a sexual assault, kidnapping, and robbery that occurred on January 22, 1988, in Hartford.

51. Tillman always maintained his innocence but was convicted, after a jury trial, of all charges on September 19, 1989, based almost entirely upon the victim's eyewitness identification.

52. The semen found on the victim's clothes in Tillman's case was tested in 1990 but at that time DNA testing had not advanced sufficiently to obtain a conclusive result.

53. In 2005 and 2006, DNA testing was again performed on the victim's clothing in Tillman's case.

54. The advancements in DNA testing allowed conclusive findings that excluded Tillman as the perpetrator of the January 22, 1988, assault.

55. Tillman was officially exonerated by DNA testing on July 11, 2006.

C. <u>Exoneration of Hubert Thompson</u>

56. Thompson filed a Petition for Habeas Corpus in 2007 to restore his appellate rights.

57. Upon restoration of his appellate rights, Thompson withdrew his Petition for Habeas Corpus and filed an appeal from his conviction on March 10, 2008.

58. Thompson exhausted all state appeals of his conviction on January 19, 2010, when the Connecticut Supreme Court denied his petition for certiorari, *State v. Thompson*, 294 Conn. 932 (2010).

59. Thompson filed a Petition for a Writ of Habeas Corpus in 2010 after exhausting his post-conviction appeals.

60. Thompson's counsel in the habeas matter, Attorney William T. Koch ("Attorney Koch"), reviewed a July 28, 1995, state laboratory report related to the examination of Doe at Saint Francis Hospital on September 23, 1994.

61. The state laboratory informed Attorney Koch that the "rape kit" and the items seized, including the purple underwear taken from Doe at the hospital, had been returned to the HPD.

62. Attorney Koch visited the HPD on January 4, 2011, and discovered that the "rape kit" had been stored with the "old evidence" in a trailer parked behind the department's headquarters.

63. The Superior Court in Hartford where Thompson was sentenced on November 20, 1998, granted a Petition for DNA Testing in 2011 filed by Attorney Koch on Thompson's behalf.

64. The advancements in DNA testing between 1995 and 2011 resulted in a confirmatory finding for the presence of semen on the purple underwear where no semen had been detected in 1995.

65. The DNA found on the purple underwear matched a known felon who lived near Doe and had similar build, complexion, and facial features to Thompson.

66. Thompson was released from incarceration on March 12, 2012, and a new trial ordered.

67. All charges against Thompson were dismissed on July 19, 2012.

D. Thompson's Innocence and Wrongful Incarceration

68. Thompson made claim to the Office of the Claims Commissioner for compensation pursuant to § 54-102uu on August 3, 2012, claiming wrongful incarceration from December 12, 2007, through March 12, 2012.

69. The Office of the Attorney General provided notice to Thompson on January 2, 2014, that Connecticut would not contest Thompson's innocence.

70. Thompson was compensated by Connecticut for losses awarded under § 54-102uu in 2014.

## CLAIMS AND VIOLATIONS

## COUNT ONE

Fourteenth Amendment to the United States Constitution
Article 1, § 8, of the Connecticut Constitution
Denial of Due Process, 42 U.S.C. § 1983
Against Pesce, Bergenholtz, and Evidence Officer

71. Paragraphs 1 through 70, above, are hereby incorporated as part and in support of Court One.

72. Thompson held a liberty interest since the enactment of No. 242 of the Public Acts of 2003, § 6, codified as section 54-102kk of the Connecticut General Statutes, in demonstrating his innocence with newly-discovered DNA evidence.

73. The Due Process Clause in both the Fourteenth Amendment to the United States Constitution and Article 1, § 8, of the Connecticut Constitution and Connecticut's post-conviction relief statute, § 54-102kk, provided Thompson a constitutional right to the benefit of advanced DNA testing methods not available at the time of Thompson's conviction in 1998.

74. During the entirety of Thompson's post-conviction proceedings a prosecutor represented Connecticut, first in the Petition for Habeas Corpus, next in *State v. Thompson*, 118 Conn. App. 140 (2009) and Thompson's petition for certiorari to the state Supreme Court, and finally in Thompson's second Petition for Habeas Corpus filed in 2010.

75. During the entirety of these post-conviction proceedings, HPD evidence officers were subject to the statutory mandates of § 54-86c(e) and state and federal constitutional guarantees of due process to disclose in writing any exculpatory information or material they had with respect to the investigation of the sexual assault that occurred on September 23, 1994.

76. HPD evidence officers were deliberately indifferent to exculpatory materials stored by the department as evidence in Thompson's case while the post-conviction proceedings were pending.

77. HPD evidence officers knew or should have known that a "rape kit" stored from a 1994 sexual assault case contained exculpatory evidence after the department was provided notice through the nationally-publicized exoneration of James Tillman in 2006 that evidence stored by the department in Thompson's case, similar to the evidence store by the department in Tillman's case, proved exculpatory when provided to the state laboratory for DNA testing.

78. The Defendants' conduct in failing to disclose the exculpatory DNA evidence violated principles of fundamental fairness such that Thompson was wrongfully deprived of his right to procedural due process.

79. Thompson suffered damages arising from the Defendants' violations of his state and federal constitutional rights.

## COUNT TWO

Fourteenth Amendment to the United States Constitution
Article 1, § 8 of the Connecticut Constitution
Denial of Due Process, 42 U.S.C. § 1983
Against Rovella

80. Paragraphs 1 through 70 and 72 through 78, above, are hereby incorporated as part and in support of Court Two.

81. The City of Hartford's procedures for identifying DNA evidence for submission to the state laboratory for exculpatory DNA testing is constitutionally inadequate.

82. The City of Hartford's failure to create and enforce a coherent evidence management system to identity evidence for submission to the state laboratory for exculpatory DNA testing violated principles of fundamental fairness such that Thompson was wrongfully deprived of his right to procedural due process.

83. The City of Hartford's training and supervision of its evidence officers in identifying and maintaining adequate records of DNA evidence for submission to the state laboratory for exculpatory testing is constitutionally inadequate.

84. The City of Hartford's procedures for accessing evidence for submission to the state laboratory for DNA testing violates principles of fundamental fairness such that Thompson was wrongfully deprived of his right to procedural due process.

85. Thompson suffered damages arising from the City of Hartford's constitutionally inadequate procedures for identifying DNA evidence for submission to the state laboratory for exculpatory testing and its failure to train and supervise its evidence officers from 2003 through 2014.

**COUNT THREE**

Fourteenth Amendment to the United States Constitution
Failure to Intervene, 42 U.S.C. § 1983
Against Rovella, Kozieradzki, Pesce, Bergenholtz, Evidence Officer, and CAPERS Supervisor

86. Paragraphs 1 through 70 and 72 through 78, above, are hereby incorporated as part and in support of Court Three.

87. The Defendants had a reasonable opportunity to intervene prior to the commencement of Thompson's incarceration on December 12, 2007, to submit the DNA evidence collected in Thompson's case to the state laboratory for exculpatory DNA testing.

88. In failing to intervene the Defendants were deliberately indifferent to a substantial risk that Thompson would be incarcerated commencing on December 12, 2007, for a crime Thompson did not commit.

89. The Defendants' deliberate indifference to a substantial risk of harm was a risk that caused Thompson harm between December 12, 2007, when Thompson was incarcerated and January 2, 2014, when Connecticut ultimately admitted that the dismissal of Thompson's case was due to Thompson's innocence.

## COUNT FOUR

Fourth and Fourteenth Amendments to the United States Constitution
Article 1, § 7 of the Connecticut Constitution
Unreasonable Seizure of Person, 42 U.S.C. § 1983
Against Kozieradzki and CAPERS Supervisor

90. Paragraphs 1 through 70 and 72 through 78, above, are hereby incorporated as part and in support of Court Three.

91. As a result of Kozieradzki's and the CAPERS Supervisor's improper investigation of the September 23, 1994, report by Doe of a sexual assault, Thompson was maliciously and without probable cause arrested for the sexual assault and kidnapping of Doe when Doe's statement lacked reliability and credibility and there was no physical evidence that connected Thompson to the crime, no investigation of the crime scene, and no attempt to locate potential witnesses to the crime.

13

92. The investigation and the arrest warrant based on the improper investigation violated clearly established constitutional rights under the Fourth and Fourteenth Amendments to the United States Constitution and Article 1, § 7, of the Connecticut Constitution which protect individuals from wrongful, false, and malicious arrest.

93. Thompson suffered damages as a direct and proximate result of his false arrest, including an unfair trial and wrongful conviction, wrongful imprisonment, and related physical, emotional and monetary damages.

## **COUNT FIVE**

Intentional Infliction of Emotional Distress
Against Rovella, Kozieradzki, Pesce, Bergenholtz, Evidence Officer, and CAPERS Supervisor

94. Paragraphs 1 through 70 and 72 through 78 and 91 through 92, above, are hereby incorporated as part and in support of Court Five.

95. Kozieradzki and the CAPERS Supervisor maliciously and without probable cause arrested Thompson.

96. Pesce, Bergenholtz, and the Evidence Officer(s) (2003-2014) withheld exculpatory material that ultimately exonerated Thompson.

97. The Defendants knew or should have known that their actions would in probability cause Thompson's emotional distress and their conduct was the direct and proximate cause of Thompson's extreme and severe emotional distress occasioned by his suffering severe mental anguish including, but not limited to, humiliation, indignities and embarrassment, and degradation.

## COUNT SIX

Negligent Infliction of Emotional Distress
Against Rovella, Kozieradzki, Pesce, Bergenholtz, Evidence Officer, and CAPERS Supervisor

98.     Paragraphs 1 through 70 and 72 through 78 and 91 through 92, above, are hereby incorporated as part and in support of Court Six.

99.     Kozieradzki and the CAPERS Supervisor maliciously and without probable cause arrested Thompson.

100.    Pesce, Bergenholtz, and the Evidence Officer(s) (2003-2014) withheld exculpatory material that ultimately exonerated Thompson.

101.    The Defendants created an unreasonable and foreseeable risk of causing Thompson emotional distress because they knew, or should have known, that their conduct might, and did, result in Thompson's arrest, prosecution, conviction, restraint and incarceration and their conduct was the direct and proximate cause of Thompson's extreme and severe emotional distress occasioned by his suffering severe mental anguish including, but not limited to humiliation, indignities and embarrassment, and degradation.

## COUNT SEVEN

General Statutes § 52-557n Direct Action Against Municipality
Against Rovella, Pesce, Bergenholtz, Evidence Officer, and CAPERS Supervisor

102.    Paragraphs 1 through 70 and 72 through 78 and 91 through 92, above, are hereby incorporated as part and in support of Court Seven.

103.    The CAPERS Supervisor, acting in a supervisory capacity, was under a duty to Thompson to diligently, fairly, and accurately investigate crimes and arrest and prosecute persons only when there was probable cause to do so.

104. Pesce, Bergenholtz, and the Evidence Officer(s) (2003-2014) were under a duty to disclose exculpatory material and information.

105. The Defendants breached their duties by arresting and facilitating Thompson's prosecution, conviction, and incarceration for the sexual assault and kidnapping of Doe when Thompson was innocent and the Defendants knew, or reasonably should have known, that probable cause against him did not exist, and that their actions would cause Thompson severe emotional distress.

106. The acts and omissions by the Defendants were the direct and proximate cause of Thompson's injuries because the Defendants knew, or should have known, that their conduct might, and did, result in Thompson's arrest, prosecution, conviction, restraint and incarceration when Thompson was innocent.

**PRAYER FOR RELIEF**

WHEREFORE, the Plaintiff has suffered damages and requests this Court:

    A.    Award compensatory and punitive damages;

    B.    Issue an injunctive order mandating that the City of Hartford create and enforce a coherent evidence management system to identity evidence for submission to the state laboratory for exculpatory DNA testing;

    C.    Award reasonable attorney's fees and costs; and

    D.    Award such other further relief as this Court may deem appropriate.

                              PLAINTIFF
                              HUBERT THOMPSON

BY: _____
          Rachel M. Baird (ct12131)
          Rachel M. Baird & Associate
          15 Burlington Road
          Harwinton, CT 06791
          Tel: (860) 605-9340
          Fax: (860) 605-9342
          Email: rbaird@rachelbairdlaw.com

*His Attorney*

Dated this 25th day of November, 2015, at Harwinton, Connecticut.